**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TITO RIVERA, | ) | Civil Action No. 2: 13-cv-1394 |
| | ) | |
| Petitioner, | ) | |
| | ) | Chief United States Magistrate Judge |
| v. | ) | Cynthia Reed Eddy |
| | ) | |
| SUPERINTENDENT of SCI Mercer, THE | ) | |
| DISTRICT ATTORNEY OF | ) | |
| ALLEGHENY COUNTY, and the PA | ) | |
| STATE ATTORNEY GENERAL, | ) | |
| Respondents. | ) | |

**MEMORANDUM OPINION**[1]

**Introduction**

This matter is before the Court on remand from the United States Court of Appeals for the Third Circuit in connection with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Tito Rivera ("Rivera" or "Petitioner"). *Rivera v. Superintendent Houtzdale SCI*, No. 16-2243, 738 F. App'x 59 (3rd Cir. 2018) (unpublished opinion). In accordance with the remand order, the Court held an evidentiary hearing on July 23, 2019, the official transcript of which has been filed of record and considered by the Court. (ECF No. 129). The parties have filed post-evidentiary hearing briefs. (ECF Nos. 127 and 128). After careful consideration of the parties' submissions and the credible evidence of record, and for the following reasons, the Court concludes that Rivera is not entitled to relief.

---

[1]    The parties have consented to have a United States Magistrate Judge conduct any and all further proceedings in the case, including entry of final judgment. *See* ECF Nos. 8 and 10.

## Procedural History

This Court's Memorandum Opinion and Order (the "Opinion") filed on April 13, 2016 (ECF No. 14), provides a detailed description of the factual background and procedural history of the case. Because the Court writes primarily for the parties, who are familiar with the facts and proceedings in this case, the Court incorporates by reference the procedural history from the above referenced Opinion and will not repeat same herein. The Court recites only the factual background that is relevant to the sole issue that has been remanded: whether Rivera's due process rights were violated by the pretrial transfer of his criminal case from Allegheny County Court of Common Pleas Judge Kevin G. Sasinoski to Allegheny County Court of Common Pleas Judge Donna Jo McDaniel.

In a criminal information filed on November 26, 2007, the Commonwealth charged Rivera at Docket No. CP-01-CR-0013002-2007 with one count of Burglary (Count 1), six counts of Robbery (Counts 2 – 7), one count of Rape (Count 8), two counts of Involuntary Deviate Sexual Intercourse (Counts 9 – 10), one count of Aggravated Indecent Assault (Count 11), one count of Indecent Assault (Count 12), six counts of Terroristic Threats (Counts 13 – 18), and one count of Simple Assault (Count 19). Prior to jury selection, the aggravated indecent assault charge was withdrawn. A jury acquitted Rivera of the simple assault charge and convicted him on the remaining charges. He was sentenced to eight (8) consecutive terms of imprisonment of 10-20 years at each of the Robbery, Rape, and IDSI counts, for an aggregate term of imprisonment of 80-160 years.

He filed a direct appeal with the Pennsylvania Superior Court, which affirmed his conviction and sentence. On July 7, 2010, the Pennsylvania Supreme Court denied further review. Thereafter,

Rivera learned, through an article published by the Pittsburgh Post-Gazette, that a court employee sent an e-mail to a court administrator that appeared to ask for the reassignment of Rivera's case to a different judge. That court employee was the uncle of one of the victims. The case was later reassigned to Judge McDaniel, who presided over the jury trial and imposed the sentence.

*Rivera*, 738 F. App'x at 60.[2]

On July 6, 2011, Rivera filed a *pro se* petition for relief pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Const. Stat. § 9541- 9546. (ECF No. 127-7). His appointed attorney filed a "No Merit" letter, addressing, *inter alia*, the due process issue regarding the reassignment of the case:

It is true that Defendant's case was transferred from Judge Sasinoski to then Criminal Court Administrative Judge McDaniel (she is now President Judge), who at the time presided over a (sic) most of the rape sexual assault cases in the county. Mr. Matta, who was related to rape victim Dilliger, made the request to Court Administrator Lynch. The trial was originally scheduled to be held before Judge Sasinoski on 1/23/08. According to newspaper accounts, Mr. Matta (who was only 10 days away from having his job eliminated by the re-arrangement of county row offices) sent an email to Ms. Lynch on 12/28/07, informing her that Ms. Dillinger was abroad. Matta thought the case had been assigned to A.J. McDaniel, and he wanted to see if the case could be postponed from the 1/23/08 date. The case was then re-assigned by Ms. Lynch to A.J. McDaniel, with a new trial date of 5/28/08 (that's when the instant trial began).

First, before the trial began, Judge McDaniel stated in open court, before the jury was brought in, "For the record I have spoken to both counsel and told them that the alleged victim in this case is a relative of George Matta, who was Clerk of Court who I worked with. They both said they saw no conflict nor do I feel any prejudice." TT at 3. Moreover, there is no indication, from a review of Judge McDaniel's handling of the instant jury trial, that Defendant was prejudiced in any way by her stewardship, and one cannot point to any differences that may have occurred had Judge Sasinoski presided over the jury trial.

Most importantly, this was a jury trial, not a bench trial. The determination of Defendant's guilt or a finding of not guilty was solely in the

---

[2] The Post-Gazette article only quoted portions of the email. The full contents of the email was not seen by the parties, any counsel, Judge McDaniel, or any court until it was obtained during post-remand discovery.

hands of the jury. Judge McDaniel played no part in the evaluation of the evidence or determination of guilt, and so Defendant was not prejudiced by Judge McDaniel's assignment to Defendant's case.

Additionally, it was not unusual in any way for her to handle a sex assault case; she handled the majority of them at the time.

Defendant is understandably upset with the 90 (sic) – 180 year sentence of imprisonment that then Administrative Judge McDaniel imposed, but the Superior and Supreme Courts have already determined that there was nothing improper about that sentence. One can speculate that if Judge Sasinoski had kept the case he might have imposed a less severe sentence, but that is only speculation, and he may have imposed the exact same sentence.

Since there were no improprieties in Judge McDaniel's stewardship over Defendant's jury trial (and indeed, the Commonwealth could not have presented a much stronger case against any defendant, and the Trial Court had no role in the presentation of evidence or witnesses), and her sentence imposed has been determined to be appropriate and proper, Defendant was not prejudiced in any way by the re-assignment of his case, and therefore Trial Counsel was not ineffective for failing to seek recusal of Judge McDaniel. Commonwealth v. Spotz, supra; 42 Pa.C.S. §9543(a)(2)(ii).

PCRA Counsel's No-Merit Letter (ECF No. 127-8 at 17). The PCRA court dismissed the petition without an evidentiary hearing. In denying Rivera's PCRA petition, Judge McDaniel opined:

The Defendant points to the lengthy sentence he received – though he neglects to mention that the sentence has been affirmed and deemed appropriate for the particular circumstances of these crimes – as evidence of the purported prejudice. Presumably, his argument is that Mr. Matta intervened on behalf of his relative to have the case transferred to this Court so that the Defendant would receive a harsher sentence.

This claim is utterly and absolutely without support. <u>First, the transfer of the case to this Court was a purely administrative matter and had nothing to do with Mr. Matta, nor was it done at his request or on his behalf.</u> Second, the Defendant has not established that the verdict or sentence imposed would have been any different had the case remained with Judge Sasisnoski (sic) or been transferred to a different judge altogether. As defense counsel point out in his "no merit" letter, the case was a jury trial and this Court did not adjudicate his guilt or innocence. Thus, he cannot establish prejudice in the verdict due to the reassignment to this Court.

As to the sentencing issue, although the Court may have a "reputation" amongst the prison population as sentencing more harshly for certain types of offenses, the Defendant's particular sentence in this case was affirmed by the Superior Court and found to be appropriate given the particularly heinous nature of the crimes[3] . . . .

PCRA Opinion, 6/25/2019, at 9-11 (emphasis added) (ECF No. 127-10, Exh. J).

Rivera filed an appeal to the Pennsylvania Superior Court, raising four grounds for relief including a claim that his due process rights were violated as a result of the inappropriate reassignment of his case. The Superior Court affirmed the denial of the PCRA petition, holding that the due process issue had been waived, "because Appellant could have raised this claim on direct appeal . . . ." *Commonwealth v. Rivera*, No. 310 WDA 2012, 2013 WL 11287687, at *6 (Pa. Super. Ct. Jan. 28, 2013).[4] The Superior Court further held that "any claim of trial counsel's ineffectiveness for failing to object to the reassignment is meritless" because Rivera failed to show prejudice. *Id*. The Pennsylvania Supreme Court denied further review.

On September 13, 2013, Rivera initiated the present proceeding by filing a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, which he improperly filed in the United

---

[3]     The Superior Court affirming Rivera's conviction and sentence noted,

this single criminal episode drastically changed the lives of six innocent people and their families. Like Appellant, the victims were young at the time of this incident. They acted out of kindness in loaning Appellant a phone, and he repaid them with violence. During the robberies and rape, Appellate repeatedly threatened to kill the victims, at times placing the gun to their heads. They will live with emotional and psychological scars from this trauma for the rest of their lives. Finally, Appellant's sentence is four times a third-degree murder sentence because he maliciously violated six individuals.

Superior Court Memorandum at 11 n.4, 11/20/09 (ECF No. 127-5 at 11).

[4]     On appeal to the Court of Appeals, Respondents conceded that Rivera's due process claim was not waived by his failure to raise it on direct appeal as he did not learn of Matta's e-mail until the publication of the Post-Gazette article on July 11, 2010, which was after Rivera's direct appeal concluded.

States District Court for the Middle District of Pennsylvania. On September 25, 2013, the case was transferred to the Western District of Pennsylvania and assigned to the undersigned. In his petition, Rivera raises five claims for relief. Without holding an evidentiary hearing, this Court denied all of Rivera's claims. Memorandum Opinion and Order of April 13, 2016. (ECF No. 14).

On appeal, Rivera presented two issues: "whether the case transfer violated his due process and whether the District Court abused its discretion by declining to conduct an evidentiary hearing on his due process claim." *Rivera,* 738 F. App'x at 60. The Court of Appeals granted a certificate of appealability on the "claim that [Rivera's] his due process rights were violated when his case was transferred by a court employee, who was a relative of the victim, to the employee's preferred judge." Order, Jan. 9, 2017. On that same day, the appellate court appointed R. Damien Schorr, Esquire, as counsel to represent Rivera on appeal.

After briefing and oral argument, the Court of Appeals vacated this Court's order, in part, and remanded the case for discovery and an evidentiary hearing stating,

> Rivera's factual allegations are not contradicted by the record and the record does not otherwise preclude habeas relief. There has been no evidentiary hearing in any court, so the record is devoid of evidence contradicting Rivera's claims. We only have his offer of the *Post-Gazette* article. That article neither proves nor disproves Rivera's allegations. Nothing else in the record precludes habeas relief.

> An evidentiary hearing is not precluded by §2254(e)(2), and it could advance Rivera's claim. We conclude that such a hearing is warranted.

*Rivera*, 738 F. App'x at 66. That appellate decision charted the course for the post-remand discovery:

> Matta's email provides support for Rivera's allegation that Matta interfered in the assignment of a case in which his niece was the victim of a vicious rape and robbery, and that Matta did so with the purpose of securing a harsher sentence for Rivera. As the Supreme Court explained in *Caperton*, "[j]ust as no man is allowed to be a judge in his own cause, similar fears of bias can arise when - - without the consent of the other parties – a man chooses the judge in his

own cause." *Caperton*, 556 U.S. at 886. Because no hearing has been conducted on this issue, the excerpts of the e-mail are the only available evidence. We do not know whether Judge McDaniel knew of Matta's intercession. Rivera's offer of the *Post-Gazette* article provides a prima facie showing of intolerable interference by Matta which could have caused the "probability of actual bias" of Judge McDaniel to be "too high to be constitutionally tolerable." *Rippo*, 137 S. Ct. at 907.

. . .

An evidentiary hearing would allow Rivera the opportunity to discover the full text of Matta's e-mail as well as other relevant evidence, including any subsequent communications between and among the court administrator, Matta, and Judge McDaniel.

*Rivera,* 738 F. App'x at 66 (emphasis added).

Upon remand, this Court appointed R. Damien Schorr, Esquire, to represent Rivera. Guided by the appellate court's mandate and Rule 6 of the Rules governing Section 2254 cases, the parties engaged in lengthy and extensive pre-hearing discovery, including conducting the depositions of five individuals,[5] including George Matta and Judge Donna Jo McDaniel, and subpoenaing numerous documents. Importantly, the email at the heart of Rivera's claim was produced by the Chief Information Officer of Allegheny County. *See* Exh. X (ECF No. 127-24). Numerous discovery issues arose requiring multiple status hearings before this Court, *see* ECF Nos. 28, 29, 31, 41, 58, 64, 75, 88, and 101, and the rescheduling of the evidentiary hearing approximately four times. *See* ECF Nos. 43, 55, 88, and 92. Once discovery was complete and the email recovered, the evidentiary hearing was scheduled, with the agreement of all counsel, for July 23, 2019. (ECF No. 92).

On or about June 18, 2019, thirty-five days prior to the scheduled evidentiary hearing, the Court was made aware that Rivera had privately retained a new attorney, Paul R. Jubas, Esquire.

---

[5] The record reflects that Helen Lynch was not able to be deposed as she died on March 6, 2016, prior to the certificate of appealability being granted.

On that same date, the Court scheduled a telephone status conference with all counsel for June 24, 2019. (ECF No. 100). The telephonic status conference was conducted on the scheduled date and Attorneys Schorr and Jubas (whose notice of appearance had not been entered), both participated, as did Assistant District Attorney Rusheen R. Pettit. During the conference call, the Court reminded counsel that discovery had closed and that the evidentiary hearing remained scheduled for July 23, 2019. Three days later, Attorney Jubas entered his appearance on Rivera's behalf. (ECF No. 106). Accordingly, the services of Attorney Schorr, as counsel under the Criminal Justice Act, were no longer required and his representation was terminated. (ECF No. 108).[6]

On July 8, 2019, fifteen days before the scheduled hearing, Attorney Jubas filed a motion seeking to reopen and expand discovery. Specifically, counsel wanted to establish that there was a "pattern and practice of Allegheny County Court Administrators and Allegheny County Judges, to assign / reassign cases and/or request the assignment of cases to receive preferential treatment" (Mot. at ¶4, ECF No. 109), and that "Helen Lynch had a nefarious motive in her practice of assigning cases." (Reply at ¶ 5, ECF No. 119). The Court denied the motion finding that the new discovery requests were not relevant to the issue of whether Rivera's due process rights were violated. (ECF No. 122).

Attorney Jubas also filed a pretrial statement on July 8, 2019, which listed the names of thirteen possible witnesses and thirteen proposed exhibits. (ECF No. 111). Respondents objected to ten of the named witnesses, i.e, Judge Anthony M. Mariani, Judge Jeffrey A. Manning, Ray Billotte, Wendy Feldmeir, Charles Kennedy, Zygmonth A. Pines, Joe Mittleman, Paul Boaz, and

---

[6]     The Court expresses its gratitude to attorney R. Damian Schorr for accepting this CJA appointment and for the quality of his representation of his client.

Dan Reimer, and eight of the exhibits, *i.e.*, handwritten investigative notes[7] and seven newspaper articles all of which pertained to unrelated Allegheny County cases. The Court agreed with Respondents and found that the challenged ten witnesses and the challenged eight exhibits exceeded the scope of the remand evidentiary hearing and that Rivera's counsel had failed to proffer how the testimony and evidence would be relevant and/or admissible to the issue on remand.

The evidentiary hearing proceeded on the scheduled date. In attendance were Rivera and his privately-retained attorney, Paul R. Jubas, and Assistant District Attorney Rusheen R. Pettit, on behalf of Respondents. At the commencement of the hearing, Attorney Jubas indicated that he would not be calling any witnesses, but would be relying solely on the parties' Joint Exhibits.[8] Hearing Tr. at 3. (ECF No. 129). Assistant District Attorney Pettit also indicated that she would not be calling any witnesses. *Id*. at 4. Thereafter, the Court informed counsel that it would consider (i) the Joint Exhibits, all of which had been entered into evidence, (ii) the stipulated excerpts from the deposition of Alfred J. Russo, as well as the parties' stipulation that Russo was the individual who facilitated the transfer of Rivera's case from Judge Sasinoski's courtroom to Judge McDaniel's courtroom, (iii) the original briefs filed with the Court of Appeals, and (iv) the parties' post-evidentiary hearing briefs. *Id*. at 5 – 6.

---

[7] The notes are undated and unsigned and are believed to be the notes taken by Joe Mittleman, Director of Judicial Programs with the Administrative Office of the Pennsylvania Courts. The notes reference other cases that were reassigned among Allegheny County judges in the criminal division. (SEALED ECF No. 119-7).

[8] The Joint Exhibits are as follows: Joint Exhibit 1 – Deposition of Judge Donna Jo McDaniel; Joint Exhibit 2 – Deposition of George Matta; Joint Exhibit 3 – email from George Matta to Helen Lynch; Joint Exhibit 4 – Tito Rivera's criminal docket; and Joint Exhibit 5 – Tito Rivera's information. NT at 3 (ECF No. 129). *See also* ECF Nos. 127-27 (Deposition of Judge Donna Jo McDaniel; 127-26 (Deposition of George Matta); and 127-24 (email from George Matta to Helen Lynch).

The parties submitted their post-evidentiary hearing briefs. (ECF Nos. 127 and 128). Accordingly, the matter has been fully argued and briefed and is ripe for disposition.

**Standard of Review**

Rivera seeks federal habeas relief under the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA"). Where the state courts have reviewed a federal issue presented to them and disposed of the issue on the merits, and that issue is also raised in a federal habeas petition, AEDPA provides the applicable deferential standards by which the federal habeas court is to review the state courts' disposition of that issue. *See* 28 U.S.C. § 2254(d) and (e). However, "[w]here the state court fails to adjudicate or address the merits of a petitioner's claims, unless procedurally defaulted, the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact. *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).

The claim before this Court on remand was not decided on the merits in state court and was not procedurally defaulted. Therefore, the Court must conduct a *de novo* review over the legal claim.

**Discussion**

Rivera claims that the "manipulation of the judicial assignment process in his case" amounts to a "due process violation" which is a "structural error that undermines the public's confidence in an impartial judiciary." Pet's Br. at 20. Respondents respond that Rivera's due process claim is based on an erroneous premise because, as the evidence of record now establishes, George Matta, the former Allegheny County Clerk of Courts, did not request to have Rivera's case reassigned to Judge Donna Jo McDaniel. Alternatively, Respondents argue that

even assuming, arguendo, that Matta did request the reassignment, Rivera has failed to prove that his due process rights were violated.

After a thorough review of the parties' arguments, the applicable law, and the evidence of record, the Court finds that the evidence of record does not support Rivera's allegation that his case was reassigned at the request of George Matta. Moreover, assuming arguendo that Matta requested that the case be transferred, the Court finds that no structural error occurred.

A.     The Evidence of Record

The uncontroverted evidence of record obtained during post-remand discovery is as follows.

1.     *The Email from George Matta to Helen Lynch,* Joint Exh. 3, ECF No. 127-24

Ten days before Matta's position as Allegheny County Clerk of Courts would be eliminated due to the rearrangement of county row offices, he sent the following email to Helen Lynch, the Court Administrator for the Court of Common Pleas of Allegheny County, Criminal Division:

> **From**: Matta, George
> **Sent**: Friday, December 28, 2007 4:49 PM
> **To**: Lynch, Helen [ ]
> **Subject**: Date Change
>
> Helen,
> Happy New Year.
> I looked up my niece's trail (sic) and it is set for Jan 23, 2007 (sic), with Judge Sasinoski. I thought it was going to be heard by Donna Jo and secondly Logan is in Europe at this time for school. She will not be back till the next week.
>
> Can you have this changed? The cp-02-0012922-2007 a (sic) Tito Lamar Rivera. The cases are consolidated.
>
> Thanks and I appreciate all your and The Judge's good words and friendship. I truly will miss working with you guys and am hoping that we will at least do lunch every so often.

Matta Email (quoted in its entirety verbatim, except redacted email address).

2.      *Deposition Testimony of George Matta,* Joint Exh. 2, ECF No. 127-26

Matta is the former Allegheny County Clerk of Courts. He was elected to the office in 1999, starting his term in 2000 and held that position for two terms. Depo. at 10. His second term was nearing its end when he sent the email to Helen Lynch. *Id*. at 29. He testified that while he was in office, the clerk of courts oversaw the criminal side of the court system. He explained that the position was "a recordkeeping function:"

> you're in charge of all bonds that were posted  . . . you were in charge of collection of all costs and fines, its files, making sure that court records are appropriately in the court offices. You had all of the expungement under yours, you had the passports under your office, notaries came under our office. . . . But basically, it is truly the business side of the court system rather than - - we don't interpret law, we don't – we don't do a  legal side. You don't need a legal background to be the clerk of courts. You really need a business background.

Depo. at 12-13.    Matta testified that he did not know how cases were assigned to judges. While the clerk of courts' office assigned the case numbers to the cases, *id*. at 13,  his office did not handle the judicial case assignments. (*Id*. at 25).

When asked why he sent the email to Lynch, Matta testified:

A:      First of all, it's public information. A, okay. B, secondly, I'm her uncle.

Q:      I understand.

A:      And thirdly, she was in Europe. And so in looking at all those things this was the end of my term, I was leaving, and I wanted to make sure that there wasn't an issue. She was in Europe after going through a lot of counseling, and I needed a date change.

Depo. at 29.

Matta testified that there were no subsequent or follow-up communications by anyone to his email. He did not receive a response to his email from Lynch and he did not have any follow-

up conversations with Lynch regarding the matter. (*Id*. at 30-31). He additionally testified that he did not speak to Judge McDaniel or her staff about the case. (*Id*. at 36-37.) He attended "parts or all of [the trial] every day," *id*. at 45, in his capacity as a relative of a victim, and he did not have any contact with Judge McDaniel or her staff. (*Id*. at 56).

When asked about the comment in the email that he thought the case would be before Judge McDaniel, he testified as follows:

> Q:     Why was it a concern of yours that [the case] be in front of Judge McDaniel?
>
> A:     It was not a concern of mine that it was in front of Judge McDaniel.
>
> Q:     Then why did you state, I thought it was going to be heard by Donna Jo?
>
> A:     That's not a concern, that's a fact. I looked at this case and I just said I thought it was. And she traditionally handled all egregious assault cases. . . .
>
> Q:     Did you have any doubts about Judge Sasinoski being the judge on this case?
>
> A:     No. . . .
>
> Q:     The email that you sent Helen Lynch. When you sent this email, did you have the intent or the purpose of sending this email so that the Defendant in the case would get a harsher sentence?
>
> A:     No.

(*Id*. at 30, 56).

Matta was questioned extensively about the nature of his relationship with Judge McDaniel. He testified that they did not socialize and that the two did not have a personal friendship outside of a working relationship. (*Id*. at 31-34).

3.      *Deposition Testimony of Alfred J. Russo,* Pet's Exh. 1, ECF No. 27-28, Exh. BB.

During the relevant time period, Russo was the Manager of the Allegheny County Criminal Division minute clerks.  The parties stipulated that Helen Lynch personally handed a printout of Matta's email to Russo and Russo facilitated the transfer of the case from Judge Sasinoski's courtroom to Judge McDaniel's courtroom.  Hearing Transcript at 4 (ECF No. 129).

Russo testified that he told Lynch reassigning the case was "a little complicated because the case is already assigned to Judge Sasinoski," explaining that,

> A:      So that's going to require me to go to Judge Sasinoski's office, explain to him that Judge McDaniel wants the case, get the court file off of him, physically take the court file down to McDaniel's clerk and have them say - - told – tell that clerk, Mr. Duffy at the time, your Judge wants this case on her docket.
>
> Q:      Okay.
>
> A:      And I did all of that.
>
> Q:      Okay.  What did Sasinoski say when you took the file from him?
>
> A:      I didn't physically talk to Sasinoski.  I talked to his minute clerk whose name was Joe Terrick.  Sasinoski was not available.  And I knew Kevin personally.  And most of the time – this isn't the only case I've taken from other – but most judges are happy. . . .

(Depo at 29).

3. *Deposition Testimony of Judge Donna Jo McDaniel,* Joint Exh. 1 (ECF No. 127-27)

Judge McDaniel testified that, during the relevant time period, she was the Allegheny County Administrative Judge.  (Depo. at 10).  She testified that at the time she presided over Rivera's jury trial, she had no knowledge that George Matta had sent an email to Lynch or that Matta had any contact with Lynch.  (*Id*. at 37).  She became aware of the Matta email from a 2010 newspaper article, but the first time she actually saw the Matta email was during her deposition in this case.  She further testified that at no time did Matta make any attempts to talk

to her or her staff, and that she did not talk to him about the case before or during the trial, post-verdict, or after sentencing.  (*Id*. at 25).

As to her relationship with Matta, she testified that they worked together on occasion, did not see each other at social functions, and did not lunch together.  (*Id*. at 20-21).

Judge McDaniel testified that she learned Matta was related to one of the alleged victims in the Rivera case after the jury was selected and prior to commencement of the trial.  She saw Matta in the courtroom and, thinking he was there for court business, asked a staff member to inquire why he was there.  (*Id*. at 25).  The staff member reported back to her that Matta's niece was one of the victims in the case.  (*Id*.)  Upon learning this, Judge McDaniel disclosed the information to the parties in chambers and then again on the record. (TT at 3; PCRA Opinion at 9, ECF No. 127-10, Exh. J).

She testified that she had no personal knowledge regarding the initial judicial assignment or reassignment of this case.  (*Id*. at 16).  She testified that during the first three months that she was the administrative judge, she handled the assignment of cases because she wanted to understand how cases were being assigned.  (*Id*. at 13). But when Helen Lynch was hired as court administrator, Judge McDaniel gave Lynch the responsibility of assigning the cases. (*Id*.) Factors considered in making the assignment included the seriousness of the case, the experience of the judge, and whether it was a specialty courts case.  (*Id.* at 14).  Otherwise, most of the cases were assigned on a rotating basis.  Specifically, Judge McDaniel explained the assignment process while she was administrative judge as follows:

> Well, some judges are more talented and more experienced than other judges.  So those judges would tend to get death penalty, high publicity cases, you know, multiple defendants.   You can't do that to a new judge that just was elected last year, because you – they don't have the experience that the other judges had. So

some of the more difficult cases were assigned to some of the more qualified judges.

*Id*. at 35. According to Judge McDaniel, Lynch eventually gave some of the responsibility for case assignment to Al Russo, but Judge McDaniel did not know the time period when this occurred. *Id.*

Judge McDaniel was not handling case assignments in 2007. (*Id*.) Helen Lynch would have assigned the Rivera case to Judge Sasinoski. (*Id*. at 16). During the relevant time period, there was no policy or guidelines in place for governing how a case should be transferred from one judge to another. (*Id*. at 19). Lynch reported to Judge McDaniel, but she did not talk to her about any cases being transferred. (*Id*. at 29).

Judge McDaniel testified that during the 2007 and 2008 time frame, she was the judge assigned the majority of sexual assault cases. (Id. at 37). This assignment began in the late 1990s "[a]nd it started slow, but it just kept growing." (*Id*.).

B.    Legal Discussion

1.    *The Uncontroverted Evidence Does Not Support Rivera's Presumption that George Matta Requested Rivera's Case Be Reassigned to Judge Donna Jo McDaniel.*

In its Remand Order, the Court of Appeals opined that "Rivera's petition presents a prima facie showing which, <u>if proven,</u> would allow him to prevail on the merits." *Rivera,* 738 F. App'x at 64 (emphasis added). Rivera's claim is based on the presumption that his case was transferred to Judge Donna Jo McDaniel at the request of George Matta, the Clerk of Courts who is the uncle of one of the victims. The Court finds that the uncontroverted evidence of record obtained during post-remand discovery and presented during the evidentiary hearing belies this presumption.

Matta's uncontroverted testimony is that in writing the email to Helen Lynch, Criminal Court Administrator, he was seeking only a date change for the trial. Matta Depo. at 29. Matta's deposition testimony is consistent with the plain language of the email, which does not request or suggest a judicial reassignment. Rather, the subject line of the email states "Date change" and the email reflects, consistent with Matta's testimony, that his niece would be out of the country on January 23, 2008, the date the case was listed for trial, and he was inquiring whether the trial date could be changed.

Moreover, the Court finds that Matta's explanation during his deposition about his statement in the email that he thought the case would be heard by Judge McDaniel is consistent with the deposition testimony of Judge McDaniel. Both testified that it was well known that during the relevant time period Judge McDaniel oversaw the majority of rape and sexual assault cases in Allegheny County. Matta testified that he had no doubts about the stewardship of Judge Sasinoski and his intent in sending the email was only to obtain a date change for the trial.

The parties stipulated that Alfred J. Russo was the individual who facilitated the reassignment of the case, after he was given a printout of the Matta email from Helen Lynch. As previously explained, Lynch is deceased and, thus, any insight as to why Lynch thought Rivera's case should have been reassigned cannot be obtained.

Rivera relies on statements attributed to Lynch in two newspaper articles. *See* ECF No. 127-30, Exh. DD and ECF No. 127-31, EE. Even assuming these newspaper accounts are reliable,[9] the statements attributed to Lynch corroborate Judge McDaniel's testimony. For example, the July 11, 2010 article from the Pittsburgh Post-Gazette reflects the following:

---

[9] Courts have noted that "[g]enerally, newspaper articles and television programs are considered hearsay under Rule 801(c) when offered for the truth of the matter asserted" and

- "Both Mr. Matta and Ms. Lynch said they did nothing wrong. They both noted at the time, Judge McDaniel, who was administrative judge in the criminal division, opted to handle most rape and sexual assault cases so it made sense for her to preside over the trial."

- "When I did it, I thought nothing of it," Ms. Lynch said. "Maybe that wasn't right. I don't know. But to me because she's the rape judge. I sent it to the rape judge."

- "Ms. Lynch said she moved the trial because of Judge McDaniel's vast experience and even-handed approach to rape cases." "I don't think it was inappropriate because I was sending it to the judge who I thought was best able to handle a rape case," Ms. Lynch said. "And that's what I did with George's case, not because she was the toughest, but because she's the best."

- "Ms. Lynch, a former defense attorney, acknowledged that she would have been concerned while still practicing if she learned that a victim's relative were trying to pick the judge on a case." "But it was innocuous," Ms. Lynch said. "I don't know. I moved it because, eh, I thought Donna Jo should have the case. She has the most rape cases. I didn't think twice about it because I moved cases all the time for all sorts of reasons."

Pittsburgh Post-Gazette article, 7/11/10 (ECF No. 127-30, Exh. DD). On July 15, 2010, The Pittsburgh Tribune-Review published an article which stated that, "Lynch acknowledged that she moved the case but said she didn't think anything of it because McDaniel typically handles rape cases." (ECF No. 127-31, Exh. EE).

Rivera also alleges that Matta had a "friendship" with Judge McDaniel. This allegation is not supported by the uncontroverted record evidence. Both Matta and Judge McDaniel testified that they did not have a personal relationship outside of a professional working relationship. They did not socialize or have lunch together.

---

statements in newspapers by individuals other than the article's author "often constitute double hearsay." *Green v. Baca,* 226 F.R.D. 624, 637 (C.D.Cal. 2005) (granting defendant's motion to exclude newspaper articles, finding that the two newspaper articles lack circumstantial guarantees of trustworthiness and were not the most probative evidence available); *May v. Cooperman,* 780 F.2d 240, 262 n. 10 (3d Cir.1985) (Becker, J., dissenting) ("Ordinarily, when offered to prove the truth of the matters stated therein, newspaper articles are held inadmissible as hearsay.").

Rivera also contends that Matta wanted the case transferred to Judge McDaniel because she was known to impose harsh sentences on sex offenders. The record does not support this contention. Matta specifically testified that he did not send the email with the intent of getting a harsher sentence for Rivera. Moreover, Rivera provides no credible evidence that during the relevant time period Judge McDaniel was known to impose harsher sentences than her colleagues. Rather, Rivera relies upon opinions by the Pennsylvania Superior Court issued in 2018 involving Judge McDaniel. These opinions are not related to the Rivera case and are immaterial to the allegation that Judge McDaniel was known as a disproportional or harsh sentencer in December 2007, the relevant time period. Also, as the record reflects, Petitioner's sentence was affirmed by the Superior Court and found to be appropriate given the particular circumstances of these crimes.

For all these reasons, the Court finds that the uncontroverted evidence of record does not support Rivera's allegation that Matta requested a judicial reassignment.[10]

> 2. Even Assuming, Arguendo, that George Matta Requested a Judicial Reassignment, There is No Record Support that Such Communication Influenced Judge McDaniel's "Goal in Rivera's Case." *Rivera*, 738 F App'x at 65.

The Supreme Court of the United States has identified two kinds of errors: structural and trial. *Arizona v. Fulminante*, 499 U.S. 279, 306–10 (1991). "A structural error is a defect in the trial mechanism itself, affecting the entire trial process, and is per se prejudicial." *Hassine v. Zimmerman*, 160 F.3d 941, 949 (3d Cir. 1998) (internal quotations omitted). A trial error, on the

---

[10] The Court notes that Respondents put forth a plausible explanation that Lynch may have transferred the case after realizing that it should have been assigned to Judge McDaniel from the outset. The first listed count in the Information is the burglary charge. The rape and sexual assault charges are found in Counts 8-12 of the Information. *See* Jt. Exh. 5. Respondents opine that it is conceivable that the original case assignment was based on the first listed count, burglary. Again, without hearing from Helen Lynch, there is no evidence on this record from which a determination can be made as to the reason(s) why Lynch reassigned the case.

other hand, is an "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, at 307-08.

Structural errors have been found in a very limited class of cases: 1) a total deprivation of the right to counsel, 2) lack of an impartial trial judge; 3) unlawful exclusion of grand jurors on the basis of race; 4) denial of the right to self-representation at trial; 5) denial of the right to a public trial; and 6) an erroneous reasonable doubt instruction to the jury. *Lewis v. Pinchak*, 348 F.3d 355, 357 (3d Cir. 2003). A structural error determination is a case-by-case inquiry. *Neder v. U.S.*, 527 U.S. 1, 14 (1999).

The Supreme Court of the United States has declined to find an unconstitutional risk of bias in all but a few narrow circumstances. Before its decision in *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009), the Supreme Court had only required disqualification of a judge in two types of situations. The first was "when the judge ha[d] a financial interest in the outcome of the case," and the second was "when the judge [was] trying a defendant for certain criminal contempts." *Id*. at 890 (Roberts, C.J., dissenting). *See, e.g., Tumey v. Ohio*, 273 U.S. 510 (1927) (requiring recusal as judge had pecuniary interest in outcome of case); *Sullivan v. Louisiana*, 508 U.S. 275 (1993) (requiring recusal where judge denied a defendant the right to a jury verdict and instead substituted his own).

In *Caperton*, the Court held that there is an unconstitutional risk of bias "<u>when a person with a personal stake in a particular case had a significant and disproportionate influence</u> in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." *Id.* at 884 (emphasis added). The narrowness of its holding

reflected the Court's perception that it was dealing with an "extreme case" that presented "an extraordinary situation" with facts it considered "extreme by any measure." *Id*. at 887. This, the Court explained, was characteristic of its recusal cases, each of which "dealt with extreme facts that created an unconstitutional probability of bias that 'cannot be defined with precision.' " *Id*. (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986)).

The Court next revisited its recusal jurisprudence in *Williams*. There, once again, the Court framed its holding narrowly: "[W]here a judge has had an earlier significant, personal involvement as a prosecutor in a critical decision in the defendant's case, the risk of actual bias in the judicial proceeding rises to an unconstitutional level." *Williams*, 136 S. Ct. at 1910.

In its Remand Opinion, in addition to discussing the *Caperton* and *Williams* cases, the Court of Appeals noted that it

> has held that a judge was statutorily disqualified when he, 'in stark, plain and unambiguous language, told the parties that his goal in the criminal case, from the beginning, was something other than what it should have been and, indeed, was improper." *United States v. Antar*, 53 F.3d 568, 576 (3d Cir. 1995), *overruled on other grounds by Smith v. Berg*, 247 F.3d 532, 534 (3d Cir. 2001). Similar concerns arise here if Matta's communications <u>influenced</u> Judge McDaniel's goal in Rivera's case.

> Here, Judge McDaniel's personal relationship with the uncle of the victim would not alone require her recusal on constitutional grounds, . . . . However, the added possibility that Matta, an officer of the Court who had a personal interest in the outcome, may have interceded, could require her recusal. . .

*Rivera*, 738 F. App'x at 65. (emphasis added).

After reviewing the evidence of record, the Court finds that the record is completely void of any evidence establishing that Matta's communication with Lynch improperly influenced Judge McDaniel. Therefore, any argument that Judge McDaniel was required to recuse is without merit. Judge McDaniel was an experienced judge who presided over the majority of rape

and sexual assault cases in Allegheny County. She had no knowledge of Matta's communication, she had no communication or contact with Matta about the case, she had no social friendship with Matta, she had no communication with the court administrator about the case, and she had no knowledge regarding how the case was originally assigned or the circumstances of the transfer to her courtroom. Once she was informed that a victim in the case was related to a former court official, she disclosed the information to the parties and stated on-the-record that she felt no conflict. As discussed above, the record contains no evidence that Matta interceded in an attempt to have this case reassigned.

After thoroughly reviewing the evidence of record and arguments of counsel, the Court finds that the factual situation here does not involve an extreme set of facts, such as those in the *Caperton* or *Williams* cases, that would require judicial recusal.

## Conclusion

In light of these findings, the Court finds that Rivera has not shown that Matta coordinated a judicial reassignment or that Matta preferred Judge McDaniel over Judge Sasinoski. Further, the Court finds that Matta's communication to Helen Lynch did not influence Judge McDaniel's goal in Rivera's case. Based on the uncontroverted evidence of record before the Court, Rivera is not entitled to habeas relief.

## Certificate of Appealability

A certificate of appealability will be denied as Rivera has failed to make "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2).

Dated: February 10, 2020

s/ Cynthia Reed Eddy
Cynthia Reed Eddy
Chief United States Magistrate Judge

cc:    All Counsel of Record
       (via ECF electronic notification)